UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MARIANA BOTELLO DE LA RIVA,

     Plaintiff/Petitioner,

v.                           Case No: 2:15-cv-615-FtM-29MRM

ABEL VALDEZ SOTO,

     Defendant/Respondent.

_____

### OPINION AND ORDER

This matter comes before the Court on Petitioner's Amended Verified Complaint and Petition for Return of Child Under the Hague Convention (Petition) (Doc. #3) filed on October 7, 2015. Respondent filed an Answer and Affirmative Defenses (Answer) (Doc. #26) on January 2, 2016. After ordering expedited pretrial proceedings, the Court conducted a bench trial on March 18, 2016.[1] Closing Briefs (Docs. ##49, 50) were filed on March 25, 2016.

The Petition was filed pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the Hague Convention), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 97. Petitioner alleges that Respondent has wrongfully retained their seven-year-old son (G.V.B. or the Child) in the United States since late April 2014. Petitioner seeks G.V.B.'s immediate return to

---

[1] Trial was originally set for December 18, 2015 (Doc. #4) but had to be rescheduled twice, once because Petitioner had not properly served Respondent with the Petition, and again because Respondent's counsel had a family medical emergency.

the Mexican state of Guanajuato, where the Child had been living with her since December 2009.  Respondent opposes G.V.B.'s return to Mexico.  He argues there has been no "wrongful retention" under the Hague Convention because Petitioner does not have custody rights over G.V.B. under Mexican law, and because the United States, not Mexico, has always been G.V.B.'s country of habitual residence.  Respondent claims further that Petitioner consented or acquiesced to G.V.B. remaining in the United States; it is not safe for G.V.B. to return to Mexico; G.V.B. is settled in Collier County, Florida and prefers to stay in the United States; and there is a custody case pending in Collier County Family Court that will adjudicate Petitioner's and Respondent's custody and visitation rights.  For the reasons set forth below, the Court finds that the Hague Convention requires G.V.B.'s immediate return to Mexico.

**I.**

"The [Hague] Convention was adopted in 1980 in response to the problem of international child abductions[2] during domestic disputes."  Abbott v. Abbott, 560 U.S. 1, 8 (2010).  The United States became a signatory to the Convention that same year.  Baran

---

[2] "'Abduction' as used in the Convention title is not intended in a criminal sense. That term is shorthand for the phrase 'wrongful removal or retention' which appears throughout the text, beginning with the preambular language and Article 1."  Hague International Child Abduction Convention; Text and Legal Analysis (Hague Convention Analysis), 51 FR 10494-01 (1986).  This Court similarly uses the phrases "abduction" and "pre-abduction" as shorthand for, respectively, "wrongful removal or retention" and "prior to the wrongful removal or retention."

v. Beaty, 526 F.3d 1340, 1344 (11th Cir. 2008).  In 1988, Congress ensured the Hague Convention's provisions would be implemented in the United States by passing the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 9001 et seq. (formerly cited as 42 U.S.C. § 11601 et seq.).  ICARA recognizes that "international abduction or wrongful retention of children is harmful to their well-being," and emphasizes that the only effective way to combat the increasing number of international abductions is to have "concerted cooperation pursuant to an international agreement."  42 U.S.C. §§ 9001(a)(1), (3).

Together, the Hague Convention and ICARA are "intend[ed] to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings."  Hanley v. Roy, 485 F.3d 641, 644 (11th Cir. 2007) (citations omitted).  To that end, their "central feature . . . is the return remedy by which a wrongfully removed [or retained] child is to be repatriated to [his or] her home country for custody determinations."  Gomez v. Fuenmayor, 812 F.3d 1005, 1011 (11th Cir. 2016) (citing Abbott, 560 U.S. at 9).  Consistent therewith, courts evaluating Hague Petitions "ha[ve] jurisdiction to decide the merits only of the wrongful removal [or retention] claim, not of any underlying custody dispute."  Lops v. Lops, 140 F.3d 927, 936 (11th Cir. 1998) (citations omitted).

This case involves a claim of wrongful retention only, not of wrongful removal. Not every instance in which one parent refuses to return a child is a "wrongful retention" under the Hague Convention. To establish a prima facie case of wrongful retention, a petitioner must carry a two-step burden. First, to establish that a "retention" has occurred, the petitioner must show that the child has been kept outside his or her country of "habitual residence." Pielage v. McConnell, 516 F.3d 1282, 1288-89 (11th Cir. 2008). Second, for that retention to be "wrongful," it must violate the "rights of custody" afforded the petitioner under the laws of the child's pre-retention country of habitual residence, Hague Convention art. 3(a), which rights the petitioner was "actually exercis[ing]" at the time of the retention or "would have been so exercis[ing] but for the removal or retention." Id. art. 3(b). Once a petitioner meets the burden of establishing these three "wrongful retention" elements by a preponderance of the evidence,[3] the court typically "shall order the return of the child forthwith." Id. art. 12; see also 22 U.S.C. § 9001(a)(4); Lozano v. Montoya Alvarez, 134 S. Ct. 1224, 1234 (2014); Baran, 526 F.3d at 1345.

There are, however, several exceptions to the rule that a wrongfully removed or retained child must be returned to his or

---

[3] 22 U.S.C. § 9003(e)(1)(A).

her place of habitual residence.  A court is not bound to order the return of a child if the respondent demonstrates by a preponderance of the evidence[4] that: the person having care of the child "had consented to or subsequently acquiesced in the removal or retention," Hague Convention art. 13(a); "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views," id. art. 13; or the proceedings seeking the child's return were commenced more than one year after the date of the wrongful removal or retention and "it is determined that the child is now settled in its new environment."  Id. art. 12.  Neither must the court return a child where the respondent shows by clear and convincing evidence[5] that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," id. art. 13(b), or that returning the child "would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."[6]  Id. art. 20.

---

[4] Id. § 9003(e)(2)(B).

[5] Id. § 9003(e)(2)(A).

[6] The Convention also creates an "exception" for when "the person . . . having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention." Hague Convention art. 13(a). This exception essentially merges with a petitioner's failure to establish a prima facie case, since, pursuant to Article 3, no removal or retention can be "wrongful" where the petitioner was not exercising custody rights.

The Eleventh Circuit has emphasized that "narrow interpretations of these exceptions are necessary to prevent them from swallowing the rule and rendering the Convention a dead letter." Gomez, 812 F.3d at 1011 (citation omitted). Even when the respondent establishes one or more exceptions, the Court may still order the return of a child. Id. art. 18; see also Lozano, 134 S. Ct. at 1237 (Alito, J., concurring); Baran, 526 F.3d at 1345. In other words, a district court has considerable discretion in deciding whether a wrongfully-retained child should be returned.

## II.

Based upon the evidence and testimony that the Court finds credible, the Court makes the following findings of fact:

Petitioner and Respondent (collectively, the parties) are both from the Mexican state of Guanajuato and are citizens of Mexico only. They knew each other in Mexico, traveled to the United States together in February 2005, and illegally remained in Florida. The parties entered into a romantic relationship in July 2005 and resided together in Florida, but they never married. Neither Petitioner nor Respondent ever had legal immigration status in the United States, and, according to his testimony, Respondent is still in the United States illegally. However, their son, G.V.B., was born in Florida on October 29, 2008 and is thus a U.S. citizen. G.V.B. is the couple's only child together,

- 6 -

and Respondent's name is listed on G.V.B.'s birth certificate as his father.  The parties lived together with G.V.B. in Florida as a family unit.  In or around June 2009, Petitioner decided she wanted herself and Respondent to return to Mexico with their eight-month-old son.  Important details of the parties' stories diverge at this point in the chronology.[7]

According to Petitioner, she and Respondent agreed that she would travel to Mexico in December 2009 to oversee the construction of a family home on the public "ranch" property where Respondents' parents live.  Petitioner testified that the parties agreed Respondent would work in the United States for another year and then join Petitioner and G.V.B. in Mexico.  Petitioner purchased one-way bus tickets for herself and G.V.B., and Respondent drove them to the bus station for their departure to Mexico.  After this departure, Respondent stayed (illegally) in the United States.

According to Petitioner, the parties remained a couple until sometime in February 2010, when they argued about her returning to work and ended their now-long-distance relationship.  Petitioner told Respondent she would not sue for child support if he agreed to send $100 in monthly support payments.  In return, Petitioner

---

[7] As the finder of fact, the Court must determine the credibility of the witnesses in this case, primarily Petitioner and Respondent. The Court considers the interests of the witnesses in the outcome of the case, any consistencies or inconsistencies in their testimony, and their candor and demeanor on the witness stand, together with any evidence that supports or refutes the testimony.

agreed that when G.V.B. was older, she would let the Child talk to Respondent on the phone and, eventually, she would send him to Florida to visit Respondent.   Respondent agreed to this arrangement and did not object to G.V.B. remaining in Mexico with Petitioner.   The parties did not put this agreement in writing.

Respondent's version of what happened is a little different. He acknowledged discussing a return to Mexico when he and Petitioner were romantically involved in the United States, but he denies that he ever intended to go back to Mexico.   Respondent stated that he and Petitioner actually broke up one month prior to Petitioner's December 2009 departure, and that the breakup was the reason Petitioner decided to return to Mexico.   He also admitted, however, that he did not object to Petitioner moving to Mexico with G.V.B., because he believed Petitioner was going to send G.V.B. to Florida to visit him.   Respondent presented no evidence that he made any attempt under the Hague Convention or otherwise to obtain G.V.B.'s return to Florida, nor that he took any steps to formalize a visitation agreement.

It is undisputed that, from December 2009 until June 2013, G.V.B. lived exclusively in Mexico with Petitioner.   Petitioner and Respondent did not have any formal custody agreement, and neither sought a judicial determination as to custody.   Petitioner married in Mexico in 2012, and she gave birth to another son sometime thereafter.   By all accounts, G.V.B. engaged in normal,

age-appropriate activities while living in Mexico, and he exclusively spoke Spanish.

Petitioner and Respondent agreed that G.V.B. would travel to the United States in June 2013 for approximately one month to spend time with Respondent. Petitioner signed a travel authorization, and G.V.B. traveled to Florida by bus with Petitioner's aunt. After spending time with Respondent, G.V.B. returned to Mexico by bus in July 2013, this time with Respondent's partner/wife. The Child resumed preschool classes at the "Jardin de Niños Pablo Neruda" school sometime thereafter.[8]

In 2014, the parties agreed that G.V.B. would again travel to the United States to spend time with Respondent, this time over the Child's Easter holidays. On March 24, 2014, G.V.B. flew to Florida with Respondent's brother. Respondent has refused to return the Child to Mexico since then.

The parties recounted different versions of their understanding as to the intended length of this trip. Petitioner testified that she sent G.V.B. to Florida in March 2014, with the agreement that the Child would return to Mexico in time to resume school on Monday, April 28, 2014, the date through which the school had excused his absence. Sometime around that date, Respondent told Petitioner there was no one to accompany the Child back to

---

[8] Respondent testified that he believes the Child was in a daycare program, not in school. However, according to the trial interpreter, "Jardin de Niños" means "kindergarten" in Spanish.

Mexico, so the Child would need to stay in the United States for another week.  Petitioner told Respondent that she did not consent to G.V.B. staying in Florida, as he needed to return to school. She testified that Respondent subsequently claimed the Child could not return to Mexico because his U.S. passport needed to be renewed.  Later, Respondent told Petitioner he wanted to spend more time with G.V.B. and planned to send him to a summer program until August 2014.  Finally, in December 2014, Respondent told Petitioner he would not return G.V.B. to Mexico at all.

Petitioner repeatedly testified that, throughout all of these discussions, she objected to G.V.B. staying in the United States and continuously demanded his return to Mexico.  Petitioner applied for a visa in December 2014 to travel to the United States to try to bring her son home to Mexico, but her application was denied.[9]  In January 2015, Petitioner sought assistance from "DIF," which the trial interpreter translated as Mexico's "Department of Families and Children."  Petitioner also filed a report with Mexico's Ministry of Foreign Affairs on January 13, 2015.  This report was sent to the U.S. State Department, which eventually led to the Petition at issue being filed in October 2015.  Since March 2014, Petitioner has not seen G.V.B. in person, but she has

---

[9] As discussed further in footnote 19, *infra*, there is also evidence that, prior to December 2014, Petitioner requested assistance from local governmental authorities in Mexico but was turned away.

attempted to maintain contact with him on the phone and over Skype in Spanish, which is the only language she speaks.

Respondent, in contrast, presented internally-contradictory testimony regarding the intended length of the Child's 2014 visit. On direct-examination, Respondent testified that the parties never discussed any return date and that, shortly after G.V.B.'s arrival, Petitioner agreed to let him stay in Florida to attend a summer program. Based on how well G.V.B. was adjusting and learning English, Petitioner then agreed to let him stay for the 2014-2015 school year. On cross-examination, however, Respondent testified that, prior to G.V.B.'s arrival in March 2014, Respondent knew the plan was for the Child to stay only for his Easter vacation period. Respondent also stated that Petitioner first objected to G.V.B. remaining in the United States in August 2014, not December 2014. Respondent testified that he did not return G.V.B. to Mexico when Petitioner objected because Petitioner told Respondent he would never see the Child again. Respondent further testified that G.V.B. is happy in Florida, attends school in Collier County, plays in a soccer league with his cousins, takes karate classes, and spends time with extended family on the weekends. Respondent asserted it has never been his intention to keep G.V.B. in the United States permanently, but he fears returning the Child to Mexico until a legally-binding custody and time-sharing agreement has been entered.

The Court will resolve the conflicting testimony below, as is necessary to decide the various issues at hand.

### III.

The two Article 4 "threshold" issues for establishing that a wrongful retention of a child has occurred under the Hague Convention – age and dual contracting status - are satisfied in this case.  It is undisputed that G.V.B. is younger than sixteen years old, and both the Republic of Mexico and the United States of America became signatories to the Hague Convention prior to the events at issue in this case.  Seaman v. Peterson, 766 F.3d 1252, 1254 n.1 (11th Cir. 2014).

### A.   Petitioner's Prima Facie Case of "Wrongful Retention"

The Hague Convention is designed to ensure the prompt return of children who have been wrongfully removed or retained. Consequently, a court may not order the return of a child without first concluding that the child has indeed been "wrongfully removed" or "wrongfully retained."

To establish a prima facie case that a child should be returned where a wrongful retention is alleged, a petitioner must first prove that the child is being kept *outside* of his country of habitual residence (the "retention" aspect).  Pielage, 516 F.3d at 1287-89.  The petitioner must then show that, at the time of the retention, (i) she had custody rights over the child under the laws of the child's country of habitual residence that (ii) were

breached by the retention, and (iii) which were actually being exercised at the time of the retention (together, the "wrongful" aspect). Id. at 1288. Here, then, Petitioner must prove by a preponderance of the evidence that: (1) G.V.B. was a habitual resident of Mexico immediately before Respondent's refusal to return the Child to her; (2) the retention breaches Petitioner's custody rights under Mexican law; and (3) Petitioner was exercising those custody rights at the time of the retention. Chafin v. Chafin, 742 F.3d 934, 938 (11th Cir. 2013). The Court will discuss each requirement in turn.

**(1) "Retention" Outside of G.V.B.'s "Habitual Residence"**

The Court must first determine "whether there has been a 'retention' at all under the Hague Convention." Pielage, 516 F.3d at 1287. Although the Convention and ICARA do not define "retention," the Eleventh Circuit has held that "the term 'retention' is meant to cover the circumstances where a child has been prevented from returning to his usual family and social environment." Id. at 1288 (citation omitted). In other words, a retention occurs when a child is not allowed to return to his place of habitual residence. "The archetype of this conduct is the refusal by the noncustodial parent to return a child at the end of an authorized visitation period." Silverman v. Silverman, 338 F.3d 886, 897 (8th Cir. 2003) (quoting Hague Convention Analysis).

Such "archetype conduct" is the basis for this Petition. Both parties concur that at some point G.V.B.'s agreed-upon 2014 visitation period ended, and Respondent nevertheless refused to return the Child to Mexico.  The question is whether keeping G.V.B. in the United States amounts to a "retention" under the Hague Convention.  <u>Pielage</u>, 516 F.3d at 1288.  This, in turn, requires the Court to decide when G.V.B. was initially prevented from returning to Mexico, and whether, immediately prior to that time, Mexico was G.V.B.'s place of habitual residence.  Hague Convention art. 3(a); <u>Fuentes-Rangel v. Woodman</u>, 617 F. App'x 920, 921 (11th Cir. 2015) (per curiam); <u>In re S.L.C.</u>, 4 F. Supp. 3d 1338, 1346 (M.D. Fla. 2014) ("[T]he only point in time when habitual residence is relevant under the Hague Convention is immediately before the retention." (citation omitted)).

> **(a)  Date Respondent First Prevented G.V.B. from Leaving the United States**

Although neither the Hague Convention nor ICARA specifies when a putative retention actually "occurs," Elisa Perez-Vera's Explanatory Report on the Hague Conference[10] observes:

---

[10] "Elisa Perez-Vera was the official Hague Conference reporter whose report is 'recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.'"  <u>Ruiz v. Tenorio</u>, 392 F.3d 1247, 1251 n.2 (11th Cir. 2004) (per curiam) (citation omitted).

> The fixing of the decisive date in cases of wrongful retention should be understood as that on which the child ought to have been returned to its custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence.

Elisa Perez-Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session 458-59, ¶ 108 (1982).  Where the parties previously agreed that the child would be returned on or by a fixed date, and that date passes without the child's return, courts typically find the agreed-upon date to be the relevant one for determining the child's place of habitual residence.  E.g., Roque-Gomez v. Tellez-Martinez, No. 2:14-CV-398-FTM-29DN, 2014 WL 7014547, at *6 (M.D. Fla. Dec. 11, 2014); Taveras v. Morales, 22 F. Supp. 3d 219, 232 (S.D.N.Y. 2014) (collecting cases); Chechel v. Brignol, No. 510-CV-164-OC-10GRJ, 2010 WL 2510391, at *7 (M.D. Fla. June 21, 2010). However, if the petitioner has agreed to extend that date, the relevant date is the end of the extension period.  In re Ahumada Cabrera, 323 F. Supp. 2d 1303, 1312-13 (S.D. Fla. 2004).

There are three arguable dates for when Respondent prevented G.V.B. from returning to Mexico: (1) April 29, 2014, which is one day after Petitioner expected G.V.B. to have returned to Mexico; (2) August 2014, which is the month in which Respondent testified on cross-examination that Petitioner first objected to the Child remaining in the United States; or (3) December 2014, which is

when Petitioner testified that Respondent told her he would not send G.V.B. back to Mexico.

Ultimately, the Court found credible Petitioner's testimony that, although the parties did not fix an exact date by which G.V.B. would return to Mexico, they did agree that the Child would be returned by *no later than* April 28, 2014.  This testimony is supported by Petitioner's Trial Exhibit 3, a letter from G.V.B.'s school approving the Child's absence from school between March 21, 2014 and April 28, 2014.  In contrast to Respondent's inconsistent testimony, Petitioner unwaveringly testified that she expected her son to be back in Mexico after the one-month 2014 visit, and that she continuously objected to the Child staying in Florida past April 28, 2014.

Further, the Court found unconvincing Respondent's contention that Petitioner originally consented to G.V.B. staying in Florida until the end of the 2014-2015 school year and then suddenly changed her mind and demanded Respondent return the Child to Mexico.  The Court does not believe Petitioner agreed to be apart from her young son for approximately fifteen months, or that Petitioner allowed G.V.B. to attend school in Florida after having already registered him to begin elementary school in Mexico for the 2014-2015 year.  Respondent's own testimony, in fact, was that Petitioner had always told him she wanted their son to be educated in Mexico – a position Petitioner reiterated to him in December

- 16 -

2014 when, according to Respondent, she first demanded the Child's return.  Petitioner's credible testimony convinces the Court that the second visit was to be like the first: a month-long visit to Florida to spend time with Respondent, after which time G.V.B. would return to Mexico to continue his life there with Petitioner.

The Court thus finds that Petitioner has establish by a preponderance of the evidence that G.V.B.'s agreed-upon visitation period in the United States ended on April 28, 2014, and that Petitioner never consented to an extension of that period. Because the putative retention occurred on April 29, 2014, the relevant date for determining G.V.B.'s place of habitual residence is April 28, 2014.

### (b) G.V.B.'s Habitual Residence on April 28, 2014

The parties disagree on the Child's place of habitual residence in April 2014.  Respondent contends that the United States, specifically Florida, has *always* been G.V.B.'s place of habitual residence, and thus he has not "retained" his son within the meaning of the Hague Convention by keeping him in Florida.  In support, Respondent asserts that he himself never intended to go back to Mexico; it was Petitioner who unilaterally made the decision to move there with G.V.B.  Petitioner does not appear to disagree that the United States was G.V.B.'s original country of habitual residence, but she argues that Mexico had become the

Child's place of habitual residence by the time Respondent refused to return him to Mexico in April 2014.

### (i) G.V.B.'s Habitual Residence Was Initially the United States

Although "[a] child's place of birth is not automatically the child's habitual residence," Holder v. Holder, 392 F.3d 1009, 1020 (9th Cir. 2004) (citations omitted), the Court concludes that the United States was G.V.B.'s place of habitual residence when Petitioner first took him to Mexico in December 2009.  The Child was born in Florida to two parents who were living there together (albeit illegally) and who, at the time, did not intend to leave. According to Petitioner, it was not until six months prior to her actual departure – when G.V.B. was approximately eight months old – that the parties first discussed returning to Mexico.  Until December 2009, G.V.B. had never been to Mexico.  The Child is a United States citizen whose habitual residence prior to moving to Mexico was the only location he had ever known: Florida.

### (ii) G.V.B.'s Habitual Residence Changed to Mexico

While the United States was G.V.B.'s place of habitual residence in December 2009, the issue remains whether that had changed by April 28, 2014, when Respondent refused to return the Child to Mexico.  The Court concludes that G.V.B.'s habitual residence did change to Mexico sometime prior to that date.

Neither the Hague Convention nor ICARA sets forth a test for determining whether, and when, a previous habitual residence has

changed.   The Circuit Courts of Appeals utilize two different frameworks, one of which concentrates on the intent of the child,[11] and the other, on that of the parents.   See Redmond v. Redmond, 724 F.3d 729, 744-47 (7th Cir. 2013).   The Eleventh Circuit (and others[12]) adopted the Ninth Circuit's approach set forth in Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001), under which settled parental intent is the primary focus.   Ruiz, 392 F.3d at 1253. Essentially, the court asks whether the facts and testimony show that there was a settled intention shared by the "persons entitled to fix the place of the child's residence" – typically, the child's parents – "to abandon the child's prior habitual residence" and take up a new one.   Id.   If there was not a shared, settled intent to abandon the child's prior habitual residence for a new one, "the burden on the party asserting a change in habitual residence increases."   Chafin, 742 F.3d at 938 (citing Ruiz, 392 F.3d at 1254–55).   "In such cases, courts should be hesitant to find a change in habitual residence unless the facts point 'unequivocally

---

[11] See, e.g., Silverman, 338 F.3d at 898; Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995); Friedrich v. Friedrich, 983 F.2d 1396, 1401 (6th Cir. 1993).   Notwithstanding, "when the child whose habitual residence is being determined is of such a young age that he or she cannot possibly decide the issue of residency for himself or herself," then "the intentions that should be examined are those not of the child," but of the parents.   Whiting v. Krassner, 391 F.3d 540, 548 (3d Cir. 2004); see also Darin v. Olivero-Huffman, 746 F.3d 1, 11 (1st Cir. 2014).

[12] E.g., Maxwell v. Maxwell, 588 F.3d 245, 251 (4th Cir. 2009); Gitter v. Gitter, 396 F.3d 124, 132 (2d Cir. 2005).

to a change,' or the court can confidently conclude that the child's attachments have changed such that returning the[ child] to the original forum would be extremely disruptive." Id. (quoting Ruiz, 392 F.3d at 1255).

Even where there existed a settled parental intention to abandon the child's prior place of habitual residence for a new one, this is not alone sufficient to change the child's habitual residence. Ruiz, 392 F.3d at 1253. There must also be "an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized" to the new location. Id. (citing Mozes, 239 F.3d at 1078). The Court now considers these three factors in turn.

### a.   "Settled" Parental Intent

The Court finds that, when Petitioner and G.V.B. left the United States in December 2009, there was a settled intent, shared by Petitioner and Respondent, to change G.V.B.'s habitual residence to Mexico. While the parties disagree about certain facts – namely, whether Respondent would eventually join Petitioner and G.V.B. in Mexico - it is clear to the Court that both Petitioner and Respondent understood the Child would abandon his habitual residence in the United States and take up a new one in Mexico.

Petitioner testified that both she and Respondent intended to move to Mexico permanently, and that when she left for Mexico with

G.V.B. in December 2009, that was still the plan.  Respondent's conflicting testimony - that he and Petitioner had broken off their personal relationship while in the United States, which was the impetus for Petitioner and G.V.B.'s return to Mexico in December 2009 - does not undercut a finding that Respondent nevertheless intended for his son's habitual residence to change to Mexico. Most significantly, Respondent admitted, twice, that he did not object to G.V.B. moving to Mexico with Petitioner, because Petitioner was eventually going to let the Child visit the United States when the Child was old enough – a promise she kept.  So, even if Respondent never intended to relocate to Mexico, the evidence establishes that he did have a settled intent for Mexico to become his *son's* new country of habitual residence.

Even if Respondent did not share Petitioner's intent per se, the facts also "point unequivocally to a change" in G.V.B.'s habitual residence.  Chafin, 742 F.3d at 938.  Not only did Mexico supplant the United States as the center of G.V.B.'s family and social life – as the Court will soon discuss – Respondent gave no indication that he ever objected to that change.  Quite the opposite: Respondent drove Petitioner and G.V.B. to the bus stop from which they departed for Mexico,[13] knowing Petitioner intended to stay in Mexico with G.V.B. and could not legally return to the

---

[13] Although it was Petitioner who testified to this fact, the Court finds her testimony credible.  Notably, Respondent did not present testimony refuting that claim.

United States.   He never asked Petitioner to allow G.V.B. to permanently return to the United States or attempted to secure the Child's return by filing a petition under the Hague Convention. Respondent, in fact, returned G.V.B. to Mexico at the end of the one-month summer visit in 2013.   Even now, Respondent does not intend for the Child to live indefinitely in Florida; he just fears that, once he sends G.V.B. back to Mexico, Petitioner will refuse to let the Child return to the United States.   Accordingly, even absent a settled intention on Respondent's part in December 2009 that Mexico would become G.V.B.'s new country of habitual residence, the Court concludes that Respondent acquiesced to that change, such that, by April 28, 2014, G.V.B. had indeed become a habitual resident of Mexico.   Roque-Gomez, 2014 WL 7014547, at *7 (finding that child's original habitual residence changed from Florida to Mexico where "[t]he evidence show[ed] that Respondent had a consistent attitude of acquiescence over a significant period [of] time").

### b.   Physical Relocation to Mexico

The second requirement for a change of habitual residence, a physical relocation to the new geographic area, is easily established here.   It is undisputed that Petitioner and G.V.B. moved to Guanajuato, Mexico in December 2009, and that, except for the two visitation periods with his father in Florida, the Child never left Mexico.

### c.   Acclimation to Mexico

The third requirement for a change of habitual residence is the child's acclimation to the new geographic area. The acclimation inquiry focuses on whether the child's new residence has supplanted the prior habitual residence "as the locus of [the child's] family and social development." Mozes, 239 F.3d at 1084. Evidence showing that the child is fluent in the local language, attends school, and has "no appreciable connection to [his] previous residence" supports a finding that the child has become acclimatized to the new location. Seaman v. Peterson, 762 F. Supp. 2d 1363, 1377-78 (M.D. Ga. 2011), aff'd, 766 F.3d 1252 (11th Cir. 2014).

Here, there is ample objective evidence that G.V.B. became well-acclimated to life in Mexico. He left the United States when he was fourteen months old, and, on the date of the putative retention, he had spent only two additional months outside of Mexico. He attended preschool/kindergarten in Mexico, played soccer, frequently interacted with family members, including many aunts, uncles, and cousins, maternal and fraternal grandparents, and a new baby brother, and exclusively spoke Spanish. Apart from some phone calls with Respondent and the two months he spent on vacation in the United States, there is no evidence that G.V.B. maintained any appreciable connection to the United States.

Coupled with Petitioner's and Respondent's settled parental intent and G.V.B.'s physical move, this evidence of acclimation supports a finding – at least by a preponderance of the evidence – that the Child's habitual residence on April 28, 2014 was Guanajuato, Mexico.  Accordingly, Respondent's keeping G.V.B. in the United States over Petitioner's objections amounts to a "retention" under the Hague Convention.

### (2)  "Wrongful" Retention in Breach of Custody Rights

Having determined that Respondent has "retained" G.V.B. outside of the Child's country of habitual residence – Mexico – the Court must next determine whether the preponderance of the evidence shows such retention is "wrongful."  As previously discussed, under the Hague Convention, a retention is "wrongful" only where it violates rights of custody under the law of the pre-abduction place of habitual residence, which rights the petitioner was actually exercising at the time of the retention.  Pielage, 516 F.3d at 1287; see also Hague Convention art. 3; 22 U.S.C.A. § 9003(e)(1)(A).  Such custody rights arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Hague Convention art. 3.

### (a) Petitioner's Rights of Custody Under Mexican Law

Here, there has been no prior judicial determination, and there is no formal custody agreement.  Accordingly, Petitioner

must show that she had rights of custody over G.V.B. at the time of the retention by operation of Mexican law.  Marquez v. Castillo, 72 F. Supp. 3d 1280, 1286 (M.D. Fla. 2014).  So long as Petitioner possessed "a single right of custody – even a joint right" under Mexican law that was violated by Respondent's retention of G.V.B., the retention is "wrongful" under the Convention.  Furnes v. Reeves, 362 F.3d 702, 722 (11th Cir. 2004), abrogated on other grounds by, Lozano, 134 S. Ct. 1224, 1231 (2014).

Petitioner argues that Mexican law, and specifically, the law of the State of Guanajuato,[14] gives her rights of custody pursuant to the doctrine of *patria potestas* ("parental authority/responsibility" in English; "patria potestad," in Spanish).  Numerous courts, including this one, have concluded that *patria potestas* rights are indeed "rights of custody." E.g., Roque-Gomez, 2014 WL 7014547, at *9; Seaman, 766 F.3d at 1259; Whallon, 230 F.3d at 457-59; Mendoza v. Silva, 987 F. Supp. 2d 883, 903 (N.D. Iowa 2013); Saldivar, 879 F. Supp. 2d at 623-26. Included in this bundle of rights is the power to determine where a child resides, which is one of the "rights of custody" expressly

---

[14] "Mexican choice of law rules require that Mexico apply the law of the State in which the child was habitually resident immediately prior to the child's removal . . . ." Whallon v. Lynn, 230 F.3d 450, 456 n.6 (1st Cir. 2000); see also Saldivar v. Rodela, 879 F. Supp. 2d 610, 622-23 (W.D. Tex. 2012) (holding that, under Mexico's choice of law rules, the Chihuahua Civil Code "govern[ed] the determination of whether [the petitioner] ha[d] 'rights of custody' under the Convention").

recognized under Hague Convention article 5(a), and which is breached when a parent retains a child without consent.  Whallon, 230 F.3d at 458 ("[B]oth parents must consent to the removal of such child under Mexican law."); Mendoza, 987 F.3d at 903 (finding Guanajuato Civil Code afforded petitioner "a custody right to determine where [her children] resides[d]," which right was breached by the children's retention outside of Mexico).

Respondent, however, argues that Petitioner has failed to establish she possessed rights of custody under Mexican law at the time G.V.B. was retained.  The crux of his argument is that "there is no evidence that custody was ever established by a court of law in the State of Guanajuato, Mexico." (Doc. #50, p. 7.)  "This is very important," he claims, "because these rights are granted by the laws of the contracting state and are done by an administrator or judge in that particular contracting state." (Id.)  He argues this conclusion is supported by Petitioner's Exhibit 1, "a Mexican statute in the State of Guanajuato that states as follows[:] 'In case of a disagreement (regarding custody rights) the local family judge will decide, hearing the parents and the social representative for the Attorney General's Office.'" (Id.)  After conducting an independent review of relevant materials, including

Petitioner's Exhibit 1,[15] the Court finds Respondent's reading of the law of Guanajuato, Mexico to be incorrect.  Under the doctrine of *patria potestas*, as embodied in Guanajuato's Civil Code, Petitioner has had rights of custody over G.V.B. since his birth.

The operative language is found in Section One, Title Eight, Articles 469 and 471 of the Guanajuato Civil Code, which state, respectively, that "[w]hen both parents have recognized a child born out of wedlock and they live together, they will jointly exert parental authority/responsibility (*patria potestas*)," and "[w]hen the parents of a child born out of wedlock separate and in the case the parents cannot agree on the matter, the judge will designate which parent will exert parental authority/responsibility (*patria potestas*), always considering the

_____

[15] At trial, the Court tentatively admitted as Petitioner's Exhibit 1 what purported to be translated excerpts from the Civil Code for the State of Guanajuato – which excerpts were also attached as Exhibit 5 to the Amended Complaint (Doc. #3-5).  Respondent objected that the document had not been authenticated, to which Petitioner responded that, pursuant to ICARA and the Hague Convention, a court is authorized to admit or take judicial notice of evidence of foreign law without requiring proper authentication.  The Court agrees and also finds such authority under Federal Rule of Civil Procedure 44.1, which states that, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Further, the Court observes that, by citing to Exhibit 1 as authority for his contention that Petitioner lacks custody rights, Respondent abandoned or waived his objection to that evidence.  Motor Club of Am. Ins. Co. v. Hanifi, 145 F.3d 170, 175 (4th Cir. 1998); Urbanique Prod. v. City of Montgomery, 428 F. Supp. 2d 1193, 1216 (M.D. Ala. 2006) (collecting cases).

best interest of the child."[16]  (Doc. #3-5, pp. 2-3.)  This Court, considering identical provisions in the Civil Code for the State of Hidalgo, Mexico, held that where "the evidence amply establishe[d] that Petitioner and Respondent ha[d] not agreed to the terms of exertion of parental authority/responsibility over [the minor child] and . . . the matter ha[d] not been decided by a judge[,] . . . [petitioner's] rights and obligations provided by the doctrine of *patria potestas* . . . ha[d] not been severed." Roque-Gomez, 2014 WL 7014547, at *9.

So too, here.  Petitioner and Respondent each "recognized" G.V.B.,[17] and they lived together with him as a family unit for a period of time.  Although they subsequently separated, neither party testified that they disagreed over the continued exercise of *patria potestas* by both or presented evidence of any judicial decree limiting the exercise to one parent.  Accordingly, the

---

[16] Title VII, Chapter IV, Article 360 of the Federal Civil Code of Mexico describes how a mother and father "recognize" a child born out of wedlock: "The parental bond with children born outside of a marriage is established by the mother by the fact of the birth; that of the putative father is established by his voluntary acknowledgment or by a judicial final judgment declaring his paternity of the child."  One of the ways in which a father "voluntarily acknowledges" a child as his own is by having his name listed on the child's birth certificate.  Id. arts. 356, 369; see also Iracheta v. Holder, 730 F.3d 419, 425 (5th Cir. 2013). English translations of these Articles were found by using the "International Materials" tab on the online Westlaw database.

[17] Petitioner "recognized" G.V.B. when she gave birth to him, and Respondent "recognized" G.V.B. through the voluntary act of having his name listed on G.V.B.'s birth certificate.

Court finds that, at the time of G.V.B.'s retention, Petitioner's *patria potestas* custody rights remained intact, and that these rights have been breached by the retention.  Petitioner has thus satisfied the first prong of establishing that G.V.B.'s retention was "wrongful."[18]

### (b) Petitioner's Exercise of Custody Rights at the Time of G.V.B.'s Retention

The second question is whether Petitioner was exercising her *patria potestas* rights of custody at the time of the retention. Although the Hague Convention and ICARA do not specify what constitutes an "exercise" of custody rights, this Court has found persuasive the Sixth Circuit's reasoning that "the only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child."  Id. (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1065 (6th Cir. 1996)). Further, "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that

---

[18] Moreover, Article 475 of the Guanajuato Civil Code, which forbids a child from "leav[ing] the house of those who exert [*patria potestas*] without their permission," affords Petitioner a *ne-exeat* right to prevent G.V.B.'s relocation without her consent. (Pet.'s Ex. 1, Doc. #3-5, p. 3); see Saldivar, 879 F. Supp. 2d at 626-27.  The Supreme Court has held that *ne exeat* rights are "rights of custody" under the Hague Convention.  Abbott, 560 U.S. at 15-16.  Article 475 is, in fact, cited in Petitioner's two travel authorizations.  (Pet.'s Ex. 2, Docs. ##3-2, 3-3.)

person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." Id. (quoting Friedrich, 78 F.3d at 1066).

Here, the Court finds no evidence showing Petitioner ever abandoned G.V.B.  To the contrary: Apart from his two one-month vacations in Florida, G.V.B. lived exclusively with Petitioner in Mexico from December 2009 until he was retained in the United States.  Petitioner provided most, and sometimes all, of the Child's financial support.  At trial, Petitioner testified that she had given G.V.B. everything within her reach so he would have a good life.  Based on these facts, the Court is easily convinced that Petitioner was exercising her rights of custody within the meaning of the Hague Convention at the time of G.V.B.'s retention. See Porter v. Gonzalez, No. 8:09-CV-753-T-17TGW, 2009 WL 1809851, at *6 (M.D. Fla. June 24, 2009).  Accordingly, the Court concludes that Respondent has wrongfully retained G.V.B. in Florida. Consequently, the Court must grant the Petition and order G.V.B.'s immediate return to Mexico unless Respondent has met his burden of demonstrating that at least one of the narrow exceptions to mandatory repatriation exists.

**B.   Affirmative Defenses to a "Wrongful Retention"**

Respondent's Answer raised various arguments for why, even if G.V.B. has been wrongfully retained, Respondent should not be

ordered to return the Child to Mexico.    He contended that
Petitioner consented or acquiesced to G.V.B. remaining in the
United States; that it is not safe for G.V.B. to return to Mexico;
that the Child prefers to stay in Florida; and that more than one
year has elapsed since the wrongful retention and G.V.B. is well-
settled in Florida.    He also claims that there is a custody case
pending in Family Court in Collier County, Florida, which will
adjudicate Petitioner's and Respondent's custody and visitation
rights.    Although Respondent's Closing Brief did not discuss all
of these arguments, the Court finds the goals of the Hague
Convention and the interests of the parties best served by
addressing each.

### (1)  Consent or Subsequent Acquiescence to the Retention

A court is not bound to order the return of a child where the
respondent demonstrates by a preponderance of the evidence that
the person "having the care of the person of the child . . .
consented to or subsequently acquiesced in the removal or
retention."    Hague Convention art. 13(a); 22 U.S.C.A. §
9003(e)(2)(B).    This Court has previously observed that
"acquiescence under the convention requires either: evidence of an
act or statement with the requisite formality, such as testimony
in a judicial proceeding; a convincing written renunciation of
rights; or a consistent attitude of acquiescence over a significant
period." Roque-Gomez, 2014 WL 7014547, at *10 (quoting Friedrich,

78 F.3d at 1070).   Determining "acquiescence" is a subjective inquiry.   Id.; Pesin v. Osorio Rodriguez, 77 F. Supp. 2d 1277, 1288 (S.D. Fla. 1999).

Respondent contends that Petitioner has either consented or acquiesced to G.V.B. living in the United States.   Respondent presented no evidence of any "formal act" of acquiescence or "written renunciation of rights."   Rather, he claims that Petitioner failed to act for nine months, which shows, at a minimum, that she acquiesced to the new living situation.   This bare assertion is insufficient to show acquiescence, because it does not speak to Petitioner's *subjective* mindset.   It is also contradicted by Petitioner's testimony and actions, which are better indicators of that mindset.   Petitioner stated numerous times that she continuously objected to extending G.V.B.'s stay in the United States.   When Respondent told her in December 2014 that he would not send G.V.B. back to Mexico, she applied for a visa to travel to the United States and, when it was denied, she pursued

legal action to secure G.V.B.'s return.[19]  She has attempted to maintain continuous phone contact with her son.  Far from evincing "a consistent attitude of acquiescence over a significant period," it is clear that Petitioner has always wanted and tried to have G.V.B. returned to Mexico.  Particularly given this Court's duty to apply these exceptions narrowly, the Court finds that Respondent has failed to carry his burden of establishing consent or acquiescence by a preponderance of the evidence.

**(2)  The "Grave-Risk of Harm" Exception**

At trial, Respondent testified that he fears returning his son to Mexico because of the crime levels and drug cartels. Consistent with the Hague Convention's central aim of protecting children, the Convention also provides an exception to mandatory repatriation where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague

---

[19] There is also evidence that, as early as September 2014, Petitioner reached out to the local prosecutor's office in Mexico seeking help in securing G.V.B.'s return but was told that "there was no complaint to process because [she] had granted permission" for G.V.B. to travel to Florida, and that pursuing a complaint would be "detrimental for [Respondent] because they would deport him and [G.V.B.] would be left homeless and become a ward of the government." (Pet.'s Ex. 5, p. 2; see also Docs. ##3, ¶ 20; 3-4, p. 5.)  It is understandable, then, that Petitioner waited until Respondent told her in December 2014 that he would not return G.V.B. to Mexico, before she reattempted legal action, and that her first move was to apply for a visa to try to secure her son's return without aid from the same United States government she had been told would essentially render her son an orphan.

Convention art. 13(b).  There are two kinds of situations that present "grave risk" to a child: "returning the child to a zone of war, famine, or disease," and evidence of "serious abuse or neglect, or extraordinary emotional dependence."[20]  <u>Baran</u>, 526 F.3d at 1347 (quoting <u>Friedrich</u>, 78 F.3d at 1069); <u>see also</u> <u>Fernandez v. Somaru</u>, No. 2:12-CV-262-FTM-29, 2012 WL 3553779, at *11 (M.D. Fla. Aug. 17, 2012).  The Eleventh Circuit has stressed that "only evidence <u>directly establishing</u> the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination."  <u>Gomez</u>, 812 F.3d at 1012 (emphasis added) (quoting Hague Convention Analysis 10510).

In support of his claim that this exception applies, Respondent's Answer cited to a U.S. Department of State travel advisory (Doc. #26, ¶ 5).  The Court concludes that the travel advisory and Respondent's testimony as to the generalized "dangerousness" of Mexico fall far short of directly establishing by clear and convincing evidence that G.V.B. will face the type of grave risk of harm contemplated by the Hague Convention if he returns to Mexico.  Although the travel advisory "warns U.S. citizens about the risk of traveling to certain places in Mexico,"

---

[20] "In this Circuit, the district court is not required to also find that the home country is unable to protect the child from that grave risk of harm."  <u>Gomez</u>, 812 F.3d at 1012 (citations omitted).

there is, in fact, "no advisory . . . in effect" in Guanajuato, the city/municipality to which G.V.B. will return.[21]

Moreover, the Court is not aware of any case in which a district court has refused to return a child because the country to which the child will return is reputed as "dangerous."  The opposite is actually true: Courts have repatriated children even where there is evidence that the particular neighborhood in which the petitioner's residence is located is known to be dangerous and have drug activity.  E.g., Marquez, 72 F. Supp. 3d at 1287.  At least one court has also found insufficient a travel advisory warning U.S. citizens not to travel to a foreign country because of the generalized risk of harm presented by a high number of kidnappings.  Hazbun Escaf v. Rodriquez, 200 F. Supp. 2d 603, 608 (E.D. Va. 2002), aff'd sub nom., Escaf v. Rodriguez, 52 F. App'x 207 (4th Cir. 2002).  Respondent's testimony on Mexico's "dangerous" reputation and the Department of State's Mexico travel warning do not adequately establish that G.V.B. will directly face a grave risk of harm if he returns to Mexico.  Indeed, the credible evidence, including Petitioner's testimony that she would not raise her young sons in an area that is unsafe, establishes the contrary.

---

[21] U.S. Passports and International Travel - U.S. Department of State, Mexico Travel Warning (last accessed April 28, 2016), https://travel.state.gov/content/passports/en/alertswarnings/mexico-travel-warning.html.

**(3)  The "Mature-Child" Exception**

Respondent also claims that G.V.B. is mature for his young age and prefers to stay in the United States.  A court may decline to order a child's return where the respondent shows, by a preponderance of the evidence, "that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention art. 13.  The Hague Convention does not provide guidance on what constitutes an "appropriate" age and degree of maturity, and courts have resisted formulating a "mature child" test or creating a bright-line age rule.  Haimdas v. Haimdas, 720 F. Supp. 2d 183, 205 (E.D.N.Y. 2010), aff'd, 401 F. App'x 567 (2d Cir. 2010) ("Simply put, there are no established objective criteria or tests for assessing 'maturity' in the context of the mature child exception . . . ."); see also Anastacia M. Greene, Seen and Not Heard?: Children's Objections Under the Hague Convention on International Child Abduction, 13 U. Miami Int'l & Comp. L. Rev. 105, 123 (2005) ("Eventually, the Convention's framers unanimously agreed to leave to the judicial authorities the discretion to decide when a child is of sufficient age and maturity to allow consideration of their views." (footnote omitted)).

Respondent did not testify as to G.V.B.'s wishes.  More importantly, he did not state that the Child *objects* to returning to Mexico, which is the operative question for this exception.

Even if Respondent had so testified, this Court has previously found that the age of seven is too young for the child's wishes to be taken into consideration. Grijalva v. Escayola, No. 2:06-CV-569-FTM29DNF, 2006 WL 3827539, at *4 (M.D. Fla. Dec. 28, 2006). Moreover – and particularly given G.V.B.'s age – the Court would have concerns that any such "wishes" or "objections" had been influenced, even if indirectly, by Respondent, under whose care G.V.B. has been living for more than two years. See In re S.L.C., 4 F. Supp. 3d at 1349-50 (deeming unconvincing 12-year-old child's objection to returning to Mexico given her young age and the fact that she "ha[d] been under the exclusive custody of respondent for an extended period of time"); Barrera Casimiro v. Pineda Chavez, No. CIV.A.1:06CV1889-ODE, 2006 WL 2938713, at *7 (N.D. Ga. Oct. 13, 2006) (collecting cases addressing effect of parental influence).   The Court thus finds unpersuasive Respondent's contention that G.V.B. prefers to remain in the United States. Even if the Court were to consider the bare assertion that G.V.B. wishes to stay here, the Court would still conclude that ordering the Child's return best serves the aims of the Hague Convention.

**(4)  The "Settled-Child" Exception**

Respondent's main argument for why G.V.B. should not be returned to Mexico is that the Child is now "settled" in the United States.   A court may refuse to order the return of a child who has been wrongfully retained if (i) the proceedings seeking the child's

return were commenced more than one year after the date of the abduction, and (ii) the respondent has shown by a preponderance of the evidence "that the child is now settled in its new environment." Hague Convention art. 12. Determining whether a child has become "settled" is a fact-intensive inquiry that looks at multiple things, including the child's age; the stability and duration of the child's residence in the new environment; whether the child attends school consistently; the stability of the retaining parent's employment and financial circumstances; whether the child has friends and relatives in the new area; whether the child participates in community or extracurricular school activities; the child's immigration status; the respondent's immigration status; whether the child has been concealed in his new location; and the reasons for any delay in initiating the petition for the child's return. Roque-Gomez, 2014 WL 7014547, at *11 (citations omitted).

This exception is available to Respondent, since more than one year elapsed between the date of G.V.B.'s wrongful retention (April 29, 2014) and the date on which these proceedings were commenced (October 5, 2015). See Ahumada Cabrera, 323 F. Supp. 2d at 1312 (remarking that Hague Convention "proceedings are considered commenced on the day the petition is filed with the court" (citation omitted)). However, construing this exception narrowly, as it must, the Court concludes there is not enough

evidence to find that G.V.B. is sufficiently "settled" in the United States so as to warrant denying Petitioner's request to repatriate him to Mexico.

The Court acknowledges that, according to Respondent's testimony, G.V.B. seems to be doing well in Florida. The Child has lots of clothes and toys and lives in a private, two-bedroom, two-bathroom apartment with Respondent and, presumably, Respondent's partner/wife. He has consistently attended school in Collier County, where, as his school records tend to show, he is performing satisfactorily. (Resp.'s Ex. A.) He has also learned English. Respondent described G.V.B. as happy, very active, and someone who gets along with everyone. He also testified that the Child has many maternal and paternal relatives in Florida whom he sees often, and that he participates in a soccer league with his cousins and takes karate classes.

Ultimately, however, these factors are counter-balanced and outweighed by the fact that G.V.B.'s financial security in the United States is unstable, and his stay here may come to an abrupt end, since Respondent is here illegally, without a work permit, and could be "subject to deportation at anytime." Lopez v. Alcala, 547 F. Supp. 2d 1255, 1260 (M.D. Fla. 2008); see also Ahumada Cabrera, 323 F. Supp. 2d at 1314 (observing that "any stability [the child] may enjoy in the United States is significantly undermined by the Respondent's uncertain immigration status").

Although G.V.B. is a citizen of the United States, Respondent testified that if he himself is deported back to Mexico, he will take G.V.B. with him.[22]

The Court concludes that it is preferable to return G.V.B. to Mexico now, rather than to risk the Child being forced to return when he is older and more fully immersed in life in the United States.  See Ahumada Cabrera, 323 F. Supp. 2d at 1314.  In light of G.V.B.'s young age, the amount of time he spent in Mexico prior to the wrongful retention (four-and-a-half years), the fact that he still speaks Spanish with his mother, and the fact that he has many family members in Mexico, including his grandparents and his younger brother, G.V.B. can be expected to readjust to life in Mexico fairly quickly.  Accordingly, the Court finds that Respondent has not established that G.V.B. is "well-settled" in the United States by a preponderance of the evidence.

---

[22] The Court recognizes that "the current Presidential Administration has a policy of sparing noncitizens from deportation if they have children born here who are therefore citizens of the United States." Marouf v. Lynch, 811 F.3d 174, 190 (6th Cir. 2016).  Indeed, under President Obama's proposed "Deferred Action for Parents of Americans" (DAPA) plan, G.V.B.'s status as a U.S. citizen could very well shield Respondent from deportation.  See id.  Nevertheless, given the current Administration will end in approximately nine months, the uncertain future of DAPA (the constitutionality of which is under review by the Supreme Court, see Texas v. United States, 809 F.3d 134 (5th Cir. 2015), cert. granted, 136 S. Ct. 906 (2016)), and the Eleventh Circuit's admonishment that courts are to apply the exceptions to mandatory repatriation narrowly, this Court concludes that the current unlikelihood that Respondent will be deported does not adequately support a finding by a preponderance of the evidence that G.V.B. is well-settled in the United States.

Additionally, even if the preponderance of the evidence did show that G.V.B. is "well-settled" in the United States, the Court would nevertheless exercise its "equitable discretion under the Hague Convention" and order the Child's return to Mexico.  Lozano, 134 S. Ct. at 1237 (Alito, J., concurring); see also Hague Convention art. 18 (a court may "order the return of the child at any time"); Baran, 526 F.3d at 1345.  Respondent testified that he does not wish to keep the Child in Florida indefinitely; he is only retaining the Child until he has obtained an official decree from the Collier County Family Court regarding custody and time-sharing.  This claim is reiterated in Respondent's Closing Brief.  Thus, Respondent has admittedly done precisely what the Hague Convention strives to prevent – retained a child outside of his habitual residence in order to choose the forum for a custody proceeding.  See Hanley, 485 F.3d at 644.  Given that the very purpose behind the Hague Convention's return remedy is "to restore the pre-abduction status quo" while custody disputes are resolved, id. (citations omitted), the Court cannot imagine how the aims of the Hague Convention could be *better* served than by ordering G.V.B.'s repatriation to Mexico.

**(5)  The State-Court Custody Case**

At trial, the Court took judicial notice of the fact that Respondent filed a custody lawsuit in Family Court in Collier County, Florida.  The Collier County Court's docket reveals that

the suit was filed on January 22, 2016, well after Petitioner filed her Hague Convention Petition with this Court, and there is no evidence that Petitioner has yet been served in that case. Respondent seems to imply, however, that it would be improper for this Court to order G.V.B.'s return, in light of that pending custody case.   The Court rejects any such proposition.

This Court's obligation to exercise jurisdiction over cases properly filed before it is "virtually unflagging." Green v. Jefferson Cty. Comm'n, 563 F.3d 1243, 1251 (11th Cir. 2009) (quoting Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)).   Respondent's state-court lawsuit was filed after this Petition and, as far as the Court is aware, raises no claim under the Hague Convention.   Moreover, a determination that the Hague Convention requires G.V.B. be returned to Mexico does not have any effect on a state court's custody determination under Florida law.   Indeed:

> The difference in subject matter between a custody determination and an adjudication of a Hague Convention Petition is the reason for finding no interference if the Hague Convention issues have not been presented in state court. Custody litigation in state court revolves around findings regarding the best interest of the child, relying on the domestic relations law of the state court. An adjudication of a Hague Convention Petition focuses on findings of where the child was habitually located and whether one parent wrongfully removed or retained the child. These are distinct determinations . . . .

Yang v. Tsui, 416 F.3d 199, 203 (3d Cir. 2005) (internal citation

omitted)); <u>see also</u> <u>Small v. Clark</u>, No. 5:06-CV-125-Oc-10GRJ, 2006 WL 1281415, at *1 (M.D. Fla. May 9, 2006) ("[A]bstention from the exercise of federal jurisdiction over these ICARA proceedings solely because there is an ongoing state court proceeding concerning the same parties, but not the parties' rights under the Convention, is not appropriate."); <u>c.f.</u>, <u>Lops</u>, 140 F.3d at 942-44 (rejecting claim that district court had abused its discretion in declining to abstain from deciding Hague Convention petition in light of parallel, first-filed, state-court action). Therefore, this Court will not refrain from ordering G.V.B.'s return to Mexico merely because Respondent has filed a lawsuit in state court seeking to adjudicate the parties' custody rights.

Accordingly, it is hereby

**ORDERED:**

1. Petitioner's Amended Verified Complaint and Petition for Return of Child Under the Hague Convention (Doc. #3) is **GRANTED.**

2. Respondent shall surrender custody of the minor child, G.V.B., to Petitioner or Petitioner's designee **on or before May 5th, 2016** for return to Mexico. Counsel for Petitioner shall coordinate arrangements with Respondent or Respondent's counsel.

3. G.V.B. shall be returned to Mexico at Petitioner's expense.

4.    G.V.B. may be accompanied by an officer from the Mexican Consulate during his return to Mexico.   Respondent may accompany G.V.B. and the officer to Mexico at his own expense.

5.    The Clerk is further directed to enter judgment accordingly, terminate all pending motions and deadlines, and close the case.

6.    Petitioner's counsel shall immediately notify the Court when G.V.B.'s return to Mexico is complete.

**DONE and ORDERED** at Fort Myers, Florida, this 28th day of April, 2016.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record